UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JUNNE KOH,

  Petitioner,

 v.

UNITED STATES OF AMERICA,

  Respondent.

CASE NO. C18-684 RSM

ORDER DENYING PETITIONER'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

## I.   INTRODUCTION

This matter comes before the Court on Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. Dkt. #1. On March 17, 2016, the Undersigned entered Judgment in Petitioner's criminal case. *United States v. Koh*, CR15-98RSM, Dkt. #88 (W.D. Wash. Mar. 17, 2016). Petitioner was adjudged guilty of three offenses and sentenced to sixty months in prison. *Id.* Petitioner now seeks relief from that sentence on the basis that his arrest was in violation of his constitutional rights, that he received ineffective assistance of counsel, and that evidence of his possession of handguns should have been suppressed. Dkt. #1 at 4–8. The Court has determined that an evidentiary hearing is not necessary. *See* 28 U.S.C. § 2255(b). After considering the briefing and the remainder of the record, and for the reasons set forth below, the Court denies the § 2255 Petition.

ORDER – 1

## II. BACKGROUND[1]

Petition Junne Koh immigrated from South Korea to Washington State with his family around 1979. In 1984, Petitioner killed one of his brothers and was convicted of second-degree murder and was sentenced to 123 months in prison. After completing his sentence, he was ordered removed, and was deported to South Korea in 1992. Shortly thereafter, Petitioner assumed his dead brother's identity and illegally reentered the United States.

Petitioner's family apparently continued to live in Washington and in 2014, Petitioner returned to Washington to locate his family. When he could not locate them, he became concerned and contacted the Bellevue Police Department. Using his brother's name, Petitioner filed a missing persons report. Police contacted Petitioner at his parents' home to investigate the report and ultimately discovered that Petitioner possessed a handgun in the house and another handgun in a storage locker. Police also determined that Petitioner had obtained a Washington State Identification Card under his brother's identity. Law enforcement was not able to contact Petitioner in person until several months later, when he was arrested in Los Angeles, California.

Petitioner was extradited to Washington where he confessed to law enforcement and was ultimately prosecuted for federal crimes. In defense, Petitioner argued, among other things, that the officers had acted unconstitutionally in their interaction at his parents' house and in their discovery of the handguns. Petitioner sought to suppress statements he had made to law

---

[1] The background of this case is well known to the parties and laid out in detail by the Government in its Answer to the Petition. Dkt. #6 at 2–15. The Government provides detailed citations to the criminal proceedings before this Court and the excerpts of record submitted to the United States Court of Appeals for the Ninth Circuit. *Id.* at 2 n.1. Other than arguing that many of the facts are irrelevant and incendiary, Petitioner does not challenge the factual background as laid out by the Government. As such, the Court adopts the Government's summary and further summarizes without citation to the record.

ORDER – 2

enforcement and evidence obtained from his parents' house and his storage locker, including the handguns.

Because the suppression hearing turned on law enforcement's investigation into Petitioner's missing persons report and the interactions between Petitioner and law enforcement during their contact at Petitioner's parents' home, additional background is necessary. Petitioner filed a missing persons report with the Bellevue Police Department in early June 2014, indicating that he had arrived in the area in February and had been unable to locate his family. He had recently been contacted by his mother who indicated that his family was in California but would not provide a specific location. Petitioner indicated that he suspected either that Jehovah Witnesses may have kidnapped his parents or that his parents' next-door neighbor may be involved. Through their initial investigation, law enforcement learned of the 1984 murder in the family and that the next-door neighbor found it unusual that he had not seen Petitioner's parents for several months. The neighbor also indicated that Petitioner had told him that Petitioner had purchased a rifle because he did not feel safe. The initial investigator indicated concern as to Petitioner's mental state.

Bellevue Police Detectives Jerald Johnson and Andy Norton followed up on the initial investigation. Johnson learned that Petitioner's brother had apparently quit his janitorial job in February of 2014. Officers went to Petitioner's parents' house to contact Petitioner. The following relevant facts were presented to the Court during the suppression hearing:

> Around 10:45 a.m. on June 17, 2014, Johnson and [Norton] drove to see [Petitioner] at his parents' house. They arrived in an unmarked police vehicle and wore plain clothes with their firearms hidden. The detectives knocked on the door to [Petitioner's] residence and [Petitioner] answered. He identified himself as [his brother] and Johnson recognized him from the Washington State driver's license photo.

ORDER – 3

The detectives identified themselves, told [Petitioner] they were responding to his complaint about his missing parents, and asked if they could come in. [Petitioner] invited them inside. While they were all in the living room, [Petitioner] reiterated the information he had provided in the missing persons reports he submitted to the city council and police department, including that he suspected two Jehovah Witnesses and the next-door neighbor as being involved in his family's kidnapping. He said he suspected his neighbor because his neighbor had a California area code on his cell phone and the number [Petitioner's] family had called from in June had the same area code.

Johnson testified that [Petitioner] was "very polite and welcoming" and asked the officers to call him "Sam," which they did. Johnson said [Petitioner] was anxious to share information regarding his missing family. Johnson further testified that [Petitioner] seemed "nervous" and his hands were shaking. Johnson said that while [Petitioner] was "very intent in providing us with information related to" his family's disappearance, "he would get defensive when I'd ask him certain questions about the disappearance and some of his actions." On cross-examination Johnson said [Petitioner] acted defensively when Johnson asked him why he had waited several months to report his family as missing and why he told his neighbor that his family was on vacation in California if [Petitioner] thought they were missing.

Johnson and Nelson also both testified that while they were discussing the situation, [Petitioner] said if he found out his neighbor was involved in the kidnapping of his parents, "he would go next door and shoot him." Also during the interview, [Petitioner] sometimes went to a different room about four feet off the living room and returned with documents, some of which were in protective sleeves. One of the documents he provided to detectives was a pamphlet related to suicide prevention, which [Petitioner] said he took comfort in reading.

Nelson said that after [Petitioner] commented about shooting his neighbor, the detectives were "a little bit alarmed" that there might be a firearm in the house and were worried about their own safety. Based on [Petitioner's] comments, his production of the pamphlet on suicide prevention, and his demeanor, Johnson started accompanying [Petitioner] as he went to the other room to retrieve documents. Johnson would walk the approximate four feet to the bedroom door and then stand in the hallway while [Petitioner] went into the room. According to Nelson, Johnson started following [Petitioner] to "make sure that, just for our safety, that he wasn't getting a gun or anything like that." As a result, Johnson noticed blankets and other items at the end of the hallway. At one point Johnson asked [Petitioner] if he could take a look around the house to see if there was anything that might be related to the disappearance of [Petitioner's] family. [Petitioner] agreed and accompanied Johnson as he looked around the house. When they walked down the hallway, Johnson asked [Petitioner] why he had a sleeping area set up in the hallway. [Petitioner] responded that he slept there to avoid being kidnapped. Johnson also noticed padlocks attached to some of the

doors in the hallway. [Petitioner] claimed he felt safer having padlocks on the doors so no one could come through bedroom windows without him knowing.

While looking at the bedding in the hallway, Johnson noticed in plain view a knife, and a handgun on top of a holster, sitting on the floor. Johnson picked up the firearm and the knife and brought them to Norton in the living room to hold. He also explained to [Petitioner] why he was taking the handgun, which turned out to be loaded.

Johnson said he confiscated the handgun and knife based on the report of [Petitioner's] missing family, which Johnson considered questionable; [Petitioner's] comments about potentially shooting his neighbor; the suicide-prevention pamphlet; seeing that [Petitioner] had been sleeping on the floor with padlocks on bedroom doors so no one could get to him; and also because [Petitioner] became annoyed whenever Johnson pushed him on certain details of his report, all of which Johnson thought raised safety concerns. When Johnson asked [Petitioner] if he had any other weapons, [Petitioner] said he had another firearm in a storage unit. After Johnson finished looking for information related to the missing persons report, he sought to confiscate the second firearm for community safety reasons, especially in light of the fact that there was a car in the driveway to which [Petitioner] had access. Johnson told [Petitioner] he wanted to go to the storage unit to retrieve the firearm for safekeeping pending completion of the investigation. [Petitioner] agreed to take the officers to the storage unit.

[Petitioner] rode in the detectives' unmarked police vehicle to the storage unit. [Petitioner] was not handcuffed or restrained. According to Johnson and Norton, once they arrived at the storage facility, [Petitioner] went into the office and then came out and entered a gate code, allowing them to drive to the unit. [Petitioner] unlocked the unit, walked inside, picked up a box that he said contained the other firearm and then brought it out of the unit and handed it to Johnson. The detectives then drove [Petitioner] back to his parents' house.

Dkt. #6 at 5–8 (citations omitted).

Law enforcement was subsequently able to verify Petitioner's true identity and determined that he had been using his deceased brother's identity since 1998. In further email communications between Johnson and Petitioner, Petitioner indicated that he was in California looking for his parents, but that he would contact Johnson in person on a specific date. Petitioner did not meet with Johnson in person and two weeks later sent the following email to Johnson.

Dear Officer Johnson, I am sorry to be taking so long to answer your email. It is not possible for me to go to the Bellevue police department to pick up pistols.

ORDER – 5

> Because I am currently working in the North Dakota oil fields. Officer Johnson, since I am not allowed to have guns, you can seize my pistols. Also I am not allowed to live in the United States. I therefore use many identities including Sam. Hope you understand my situation. Sincerely, Sam Koh.

*Id.* at 9.

Petitioner's version of the events differed. Petitioner indicated that during his contact with the Detectives, Johnson "was aggressive" and searched his house, bedroom, bathroom, and backyard. Petitioner indicated that he did not accompany Johnson during the searches and that he was coerced into surrendering the firearms. Petitioner also testified that it was Johnson who retrieved the second handgun from the storage locker and that only after this occurred did Petitioner make a comment related to harming his neighbor. Petitioner did acknowledge that he allowed Johnson and Norton to enter his parents' home, had indicated that he took comfort in reading a suicide prevention pamphlet, and had assisted the detectives in accessing the storage facility.

Upon hearing and weighing the evidence, the Court determined that the suppression motion should not be granted as any search did not amount to a constitutional violation. Specifically, the Court explained:

> they were invited into the home voluntarily by [Petitioner]. He wanted them to investigate his missing family. He wanted them to know that there might be something nefarious going on with the neighbor, the entire discussion about the area code being the same as his neighbor's cell phone, and maybe the phone call that he had initially, earlier with the family, may have been actually through the neighbor's telephone, all of those things.
>
> Once the officers were in the home and listening to [Petitioner], as Detective Johnson testified, he had some concerns about his mental status at that point in time, not that he wasn't making sense, not that he wasn't able to understand what the officers were saying. But the pamphlet on suicide, the comment about the neighbor, all of those things would have been very concerning. Somebody says, 'I'm going to shoot my neighbor if he had anything to do with my parents missing,' the first concern would be, does he have a gun to be able to follow up on that threat?

ORDER – 6

*Id.* at 10–11.  The Court therefore found adequate justification for officers to accompany Defendant and adequate justification to seize the handguns once officers knew of them. Accordingly, the Court denied the suppression motion and the case proceeded to a stipulated-facts bench trial before the undersigned.  Petitioner was found guilty of three offenses: Felon in Possession of a Firearm, Illegal Alien in Possession of a Firearm, and Illegal Reentry After Deportation.  *United States v. Koh*, CR15-98RSM, Dkt. #88 (W.D. Wash. Mar. 17, 2016). Petitioner thereafter exhausted his direct appeals.

### III. DISCUSSION

**A. Preliminary Considerations**

A motion under 28 U.S.C. § 2255 permits a federal prisoner, in custody, to collaterally challenge his sentence claiming it was imposed in violation of the Constitution or laws of the United States, or that the Court lacked jurisdiction to impose the sentence or that the sentence exceeded the maximum authorized by law.  A petition seeking relief under § 2255 is subject to a one-year statute of limitations.  28 U.S.C. § 2255(f).  Here, the Government does not assert that the Petition is untimely or contest that the Court has jurisdiction to hear the Petition.[2]

---

[2] The Court notes that there may be a question of whether the Petition is moot.  The Petition was filed while Petitioner was confined in D. Ray James Correctional Institute.  Dkt. #1 at 1. However, Petitioner has subsequently indicated that he had served his sentence and was released from prison on November 23, 2018.  Dkt. #13 at 1; *Tyars v. Finner*, 709 F.2d 1274, 1279 (9th Cir. 1983) (holding that court maintains jurisdiction following release where petitioner was in custody at time the petition was filed, but that question of mootness remains) (citations omitted); *Lane v. Williams*, 455 U.S. 624, 631 (1982) (challenge to sentence, as opposed to conviction, mooted by release); Dkt. #1-1 at 1–2 (making clear that Petitioner challenges his *sentence*); *Abdala v. I.N.S.*, 488 F.3d 1061, 1063–64 (9th Cir. 2007) (petition moot following deportation "because successful resolution of their pending claims could no longer provide the requested relief").  Petitioner is apparently now in the custody of the United States Immigration and Customs Enforcement (ICE) awaiting possible deportation to South Korea.  Dkt. #14 at 4.  There is no question that Petitioner is "in custody," but he is in the custody of ICE.  Petitioner appears to longer be in custody because of the sentence imposed by this Court as he has served his sentence.  *Baily v. Hill*, 599 F.3d 976, 981 (9th Cir. 2010) (being held in custody "does not allow

ORDER – 7

## B. Fourth Amendment Claims

As the Government has noted, challenges pursuant to the Fourth Amendment are not available on collateral review where the Petitioner was provided a full and fair opportunity to raise the issue at trial and on direct appeal. *United States v. Hearst*, 638 F.2d 1190, 1196 (9th Cir. 1980) (citing *Tisnado v. United States*, 547 F.2d 452, 456 (9th Cir. 1976); *Stone v. Powell*, 428 U.S. 465, 494 (1976)); *Roberts v. United States*, No. 1:10CR173-1, 2015 WL 3619545, at *6 (M.D.N.C. June 9, 2015) (gathering cases in support further support). "If the provided opportunity has been squandered due to defense counsel's incompetence or misconduct, a convict's only option on collateral review is a Sixth Amendment claim based on inadequate assistance of counsel." *Hearst*, 638 F.2d at 1196 (citing *Canary v. Bland*, 583 F.2d 887, 890 (6th Cir. 1978)). For this reason, the central issue in the Petition is Petitioner's ineffective assistance of counsel claim. But, because this claim turns in part on Petitioner's other arguments, the Court will review the underlying Fourth Amendment arguments.

### 1. Petitioner's California Arrest

Petitioner first argues that a constitutional violation occurred during his arrest in Los Angeles, California, in July 2014. Dkt. #1-1 at 2. Petitioner offers scant detail, and merely alleges that law enforcement inspected—without the owner's consent—a hotel registry pursuant to a Los Angeles ordinance and that this ultimately led to Petitioner's arrest. Petitioner argues that because the ordinance that police possibly relied upon was later struck down as unconstitutional, his identity should be suppressed as "fruit of an unconstitutional search." *Id.* at 3–7 (citing *City of Los Angeles v. Patel*, ___ U.S. ___, 135 S. Ct. 2443 (June 22, 2015)).

---

challenge to all aspects of the sentence, petitioner must be attacking the lawfulness of being held in custody"). Nevertheless, because the Court concludes that the Petition otherwise lacks a legal basis, the Court does not consider this issue that the parties have not raised.

ORDER – 8

Petitioner acknowledges, however, that his argument is contrary to clear precedent laid forth by the Supreme Court in *Immigration & Naturalization Serv. v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984) ("The 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred."). Despite this clear guidance, Petitioner argues that the Supreme Court did not foreclose a different result for "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness" and that his case presents just such a situation. Dkt. #1-1 at 4–5 (quoting *Lopez-Mendoza*, 468 U.S. at 1050–51). But Petitioner does nothing to support this position beyond asking the "Court to courageously make a gut decision against unconstitutional precedents." *Id.* at 7. Petitioner does not point to any facts making the circumstance of his arrest egregious and does not provide any case law that supports his position. For these reasons and the additional reasons laid out by the Government, Dkt. #6 at 15–18, the Court finds no merit in Petitioner's argument.

**2. Suppression of Handgun Evidence**

Petitioner continues to believe that the Court erred in denying his motion to suppress in his criminal case and maintains that this provides a basis for § 2255 relief. But review of Petitioner's argument makes clear that this is merely a rehashing of arguments Petitioner made before this Court and on appeal. To the extent Petitioner challenges the outcome of the suppression hearing, Petitioner is precluded from doing so as it was already a basis for his direct appeal. Dkt. #1 at 6–7; *United States v. Redd*, 759 F.2d 699, 701 (9th Cir. 1985) (where petitioner "raised this precise claim in his direct appeal, and this court expressly rejected it," the claim "cannot be the basis of a § 2255 motion") (citing *Egger v. United States,* 509 F.2d 745, 748 (9th Cir.), *cert. denied,* 423 U.S. 842 (1975)). More precisely, it appears that Petitioner's argument

ORDER – 9

is that his counsel was ineffective in defending Petitioner at the suppression hearing. *See* Dkt. #8 at 4–5 (making clear that his primary objection to the suppression hearing related to his handguns was the performance of his trial counsel and noting that counsel did not raise Petitioner's arguments and did not cross examine police officers with Petitioner's testimony). Accordingly, and to the extent necessary, the Court addresses this argument in the context of Petitioner's ineffective assistance of counsel claim.

**C. Ineffective Assistance of Counsel**

To establish a claim for ineffective assistance of counsel, Petitioner must prove (1) that counsel's performance was deficient and, (2) that the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). To establish that counsel's performance was deficient, a petitioner must show that counsel's performance fell below an objective standard of reasonableness. *Id.* at 688. There is a strong presumption that counsel was within the range of reasonable assistance. *Id.* at 689. To establish that counsel's performance prejudiced the defense, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Petitioner makes clear that he "was very greatful [sic] for his counsels who did their best in their legal knowledge and experience to help him." Dkt. #1-1 at 7. Nevertheless, Petitioner advances ineffective assistance of counsel claims premised primarily on his counsels' strategic decisions.

Petitioner first claims that his trial counsel thought that his unconstitutional arrest argument "was useless and a waste of his time" and "[i]nstead of writing a motion to dismiss for

defendant, he filed a 'motion to allow defendant to appear pro se for limited purpose of presenting pro se motion to dismiss.'" *Id.* at 8; *but see*, *Redd*, 759 F.2d at 701 (ineffective assistance of counsel claim cannot be based on counsel's failure to raise meritless claims). Petitioner argues that he was denied the assistance of counsel when he was forced to ineffectively defend himself. But, as noted above, Petitioner's argument lacked merit and counsel's choice to not pursue the argument on his behalf was a strategic choice. *Sexton v. Cozner*, 679 F.3d 1150, 1156 (9th Cir. 2012) (disagreement concerning strategy does not establish ineffective assistance of counsel). Even so, Petitioner was not prejudiced as he does nothing to show that counsel's assistance in raising a meritless argument would have resulted in a different outcome.

This is also true to the extent Petitioner complains of his appellate counsel's failure to pursue the matter on appeal. Dkt. #1-1 at 8–10. Petitioner did not have a "constitutional right to compel appointed counsel to press nonfrivolous points requested by [him], if counsel, as a matter of professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Further, Petitioner does not demonstrate any prejudice stemming from his counsel's strategic decision. *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000) (defendant "must show a reasonable probability that, but for his counsel's unreasonable failure to [pursue an issue], he would have prevailed on his appeal").

Lastly, Petitioner's argument that he was denied effective assistance of counsel regarding the suppression hearing fails for much the same reason. Petitioner offers nothing to suggest that his desired actions—had they been taken by counsel—would have led to any different outcome. At most, the additional testimony may have added more evidence to the mix but cannot be said to have likely changed the Court's ultimate decision. *Maryland v. Kulbicki*, ___ U.S. ___, 136 S. Ct. 2, 5 (2015) (Sixth Amendment requires only "reasonable competence," not "perfect

ORDER – 11

advocacy"). Counsel's strategic choice to forego these questions was far from egregious and did not rob Petitioner of effective assistance of counsel.

D. **Certificate of Appealability**

A petitioner seeking post-conviction relief under § 2255 may appeal this Court's dismissal of his federal habeas petition only after obtaining a certificate of appealability from a district or circuit judge. The Court finds that a Certificate of Appealability ("COA") is not warranted in this case. A COA may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of [her] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). For the reasons above, the Court finds no basis to issue a COA.

## VI. CONCLUSION

Having considered the briefing and record herein, the Court hereby finds and ORDERS:

1. Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Dkt. #1) is DENIED. No COA shall be issued.

2. This matter is now CLOSED.

3. The Clerk of the Court is directed to forward a copy of this Order to Petitioner.

DATED this 25th day of April 2019.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE